Howard D. Gest (SBN: 76514)
hgest@burhenngest.com
BURHENN & GEST LLP
12401 Wilshire Boulevard, Suite 200
Los Angeles, CA 90025
Telephone: 213-629-8787

Nathan P. Eimer (*pro hac vice forthcoming*)
neimer@eimerstahl.com
Vanessa G. Jacobsen (*pro hac vice forthcoming*)
vjacobsen@eimerstahl.com
Alec Solotorovsky (*pro hac vice forthcoming*)
asolotorovsky@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600

Brian Y. Chang (SBN: 287757)
bchang@eimerstahl.com
EIMER STAHL LLP
1999 South Bascom Avenue, Suite 1025
Campbell, CA 95008
Telephone: 408-889-1670

Attorneys for Plaintiffs
Compass, Inc. and Compass California, Inc.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

COMPASS, INC.; and
COMPASS CALIFORNIA, INC.,

Plaintiffs,

v.

COMBINED L.A./WESTSIDE MLS, INC.,

Defendant.

Case No. 2:26-cv-13239

**COMPLAINT FOR:**
**(1) VIOLATION OF SHERMAN ACT § 1, 15 U.S.C. § 1**

**AND RELATED CAUSES OF ACTION**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1. Homeowners should be free to choose how to sell their own homes without having a competition-killing real estate industry organization tell them how to do it. Real estate agents should be able to compete fiercely to be hired by clients, and real estate brokers should be able to compete to attract agents to their firms, without their competitors banding together to restrict how they compete. In dozens of cities across the country, homeowners and agents are free to do that. But this much-needed competition and choice are blocked in much of Los Angeles County because of rules set and enforced by Defendant Combined L.A./Westside MLS, Inc. ("CLAW"). A majority of the members of CLAW's Board of Directors are working brokers and agents who compete with Compass and its agents, and they are dictating how Compass and its agents can and cannot compete, how Compass and its agents can and cannot serve their clients, and how homeowners can and cannot market their own homes. Plaintiffs bring this lawsuit under 15 U.S.C. § 1 and related California law to stop CLAW's anticompetitive behavior.

2. Homeowners want a choice. Plaintiffs Compass, Inc. and Compass California, Inc. (collectively, "Compass") offer a phased marketing strategy, See It First™ on Compass, that gives homeowners that choice. Some homeowners choose to use a multiple listing service ("MLS") to market their homes. Some want to publicly market their homes before they go into the MLS—through internet websites, yard signs, social media, and newsletters, among other public marketing methods. Compass and its agents do not force homeowners to use phased marketing or any other strategy; in fact, Compass requires the homeowners' written approval to publicly market outside of CLAW. Under California law, homeowners are entitled to decide how to market their own properties.

3. One reason homeowners like having this choice is that they can use pre-MLS public marketing to test the price of a home with real-world feedback from agents and their clients, which helps ensure the home is not overpriced when it lists in the

MLS and the MLS sends the listing to every real estate website and data vendor in the world. Moreover, this strategy helps agents and their clients gather feedback on price without the risk of their listings being permanently soiled by price cuts and extended "days on market" that hurt the perceived value of the homes. Homeowners love this choice: where MLSs allow phased marketing, approximately 48% of Compass homeowners used it. Even when publicly marketed pre-MLS, the vast majority of those listings actually sold in the last phase (after being submitted to the MLS). Compared with listings sent straight to the MLS, as CLAW requires, homes using phased marketing have sold for 4.6% more, with 34% fewer days on the MLS and 29% fewer price cuts.

4. CLAW, which provides MLS services to thousands of real estate professionals across a service area spanning much of Los Angeles County, is a combination of Compass' direct competitors, and it is controlled by a Board of Directors dominated by Compass' direct competitors. Under the CLAW rules, once a homeowner markets the home on a public-facing website, puts up a yard sign or a flyer in a window, sends an email blast, shares the listing through a multi-brokerage listing sharing network, or publicly markets the home in any way CLAW defines as "public marketing," the listing must be given to CLAW and its co-conspirators within one business day, and the agent and homeowner must follow the many restrictions set out in CLAW's 62-page MLS rulebook—even if the homeowner gave the agent a lawful marketing instruction that conflicts with the CLAW rules.

5. Although California law states that real estate agents owe their clients a fiduciary duty of "utmost care, integrity, honesty, and loyalty," including a duty to follow their lawful instructions,[1] if a real estate agent follows the client's lawful instruction to publicly market a home outside of CLAW, the agent then faces fines,

[1] Cal. Civ. Code § 2079.16; *Thomson v. Canyon*, 198 Cal. App. 4th 594, 607 (2011).

suspension, or expulsion from the very MLS they need to do business.[2] More than 40 years ago, in its seminal report on U.S. residential real estate, the U.S. Federal Trade Commission ("FTC") warned that when an MLS forces members to submit their listings, "[a]lternative methods of selling houses are effectively foreclosed."[3] That is what CLAW has done.

6. Compass brings this lawsuit to stop these illegal rules. Competitors may not band together to dictate how their rivals serve customers and deprive homeowners of choice. Yet that is what CLAW is doing: using control of a home listing database that real estate agents in much of Los Angeles County cannot work without, CLAW and its co-conspirators block Compass' better home marketing product to protect Compass' competitors from having to compete with Compass on the merits for clients and agents.

7. Instead of fixing its Anticompetitive Rules, CLAW has kept them in place, including in the version of its MLS rules that took effect on July 1, 2026.[4] The excuses for punishing agents for phased marketing are meritless. MLSs serving more than 350,000 brokers and agents in at least 12 states do not fine or punish pre- or off-MLS public marketing, and in these markets, the issues other MLSs claim will result from pre- or off-MLS public marketing have not transpired. Moreover, CLAW itself used to allow it. On information and belief, until 2020, CLAW allowed a seller

---

[2] The MLS™/CLAW, Data Integrity Standards: Guidelines for Data Input and Rules Enforcement (eff. Aug. 17, 2024) ("Data Integrity Standards"), https://forms.themls.com/forms/compliance_manual/Data-Integrity-Standards.pdf; *id.*, Addendum A, The MLS/CLAW™ Citation Policy ("2024 Citation Policy") §§ I, L (Tier Four); The MLS™/CLAW, Rules and Regulations, R. 14.2, at 53 (eff. July 1, 2026) ("CLAW Rules").

[3] FTC, The Residential Real Estate Brokerage Industry ("Butters Report") at 130 (Dec. 1983).

[4] CLAW Rules R. 7.5, at 16–17; *id.* R. 7.5.1, at 17.

to keep a listing out of the MLS simply by signing an exclusion certification, without any restriction on how the listing was publicly marketed.

8. CLAW and its co-conspirators have caused significant economic harm to Compass and its agents, in addition to the immense harm CLAW has caused to homeowners. Compass seeks treble damages, to the full extent allowed by the law, for every dollar of harm CLAW and its co-conspirators caused Compass. Compass paid over $175 million to defend and settle lawsuits resulting from MLS policies it could not avoid because rules like CLAW's foreclosed the option for Compass' agents to publicly market a home without giving it to CLAW, thus forcing them to follow CLAW's policies. Although the settlements were the result of MLS rules, CLAW paid nothing. Moreover, CLAW forces Compass and its agents to give their valuable home listing data to CLAW and CLAW's rules permit that data to be licensed "to any entity" on terms CLAW's Board approves. On information and belief, CLAW provides it to real estate portals and other companies and charges vendors an annual licensing fee for access to its IDX data; and there is no opt-out from the "Brokerage Back Office Data" feed through which CLAW must give that data to every competing brokerage and its designated vendors. Because Compass is subject to CLAW's rules, Compass has lost commissions on listings and agents it could not win without the ability to offer See It First™ on Compass, as well as ancillary revenue (such as mortgage, title, and escrow). All of these harms, and any others caused by CLAW's illegal rules, must be paid back in triplicate and the illegal rules must be enjoined.

## NATURE OF THE CASE

9. This lawsuit challenges the unlawful conduct of an MLS. MLSs are not pro-consumer, pro-competitive institutions; they are combinations of competing brokers

and agents that make rules governing competition among them.[5] As such, MLS rules have long been regarded warily by courts and antitrust enforcers. When a group of competitors like an MLS "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[6] As the FTC observed, the people who control the MLS "control . . . the most important aspects of brokerage practices."[7] That control has been used in the past to do things like fix commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

10. In the 1940s, the U.S. Department of Justice ("DOJ") brought civil and criminal charges against MLSs that set commission rates.[8] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[9] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[10]

---

[5] Except where applicable law or regulations would require otherwise, the terms "agent" and "broker" are used interchangeably throughout this complaint.

[6] *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1370 (5th Cir. 1980).

[7] Butters Report at 15.

[8] *See United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485, 487 (1950).

[9] *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 819 (6th Cir. 2011).

[10] *United States v. Consol. Multiple Listing Serv., Inc.*, No. 3:08-cv-01786-SB, 2009 WL 3150388, at *2 (D.S.C. Aug. 27, 2009).

11. CLAW provides MLS services to more than 16,000 real estate professionals—competing brokers and agents—covering much of Los Angeles County.[11] CLAW is governed by a Board of Directors dominated by those competitors. In fact, a majority of the members of CLAW's Board of Directors are working brokers or agents who compete with each other and with Compass and its agents.[12]

12. For decades, CLAW has been an unavoidable and dominant feature of residential real estate brokerage in much of Los Angeles County. Participation in CLAW is essential for any real estate agent to work in many areas of Los Angeles County; real estate agents cannot effectively represent clients in those areas without being members of CLAW subject to its rules. While many homeowners are well served by pre-MLS or off-MLS marketing strategies, the importance of the MLS means it is still essential for agents to belong to the MLS in the area where they work. Thus, agents cannot survive in business without participating in the MLS.

13. Showing CLAW's incredible market power, agents must follow CLAW's rules or CLAW will fine and punish them, potentially by exclusion from CLAW. CLAW polices its members through its Board of Directors, which monitors how its members (who are competitors) represent their clients. CLAW encourages competing agents to report to CLAW any rule violations by their competitors for punishment, and its Model Citation Policy provides that reports of violations will remain confidential.[13] While the MLS is one of the rare private companies that fines and punishes its own customers, agents accept this because CLAW membership is

---

[11] *2020 MLS/CLAW Area Map*, The MLS™/CLAW, https://www.themls.com/vestamapareas/; *About*, The MLS™/CLAW, https://www.themls.com/explore/about.

[12] *2026 The MLS™/CLAW Officers, Directors & Staff,* The MLS™/CLAW, https://www.themls.com/boards.cfm?tab=help.

[13] CLAW Rules Ex. A, Model Citation Policy ("Model Citation Policy") § J, at 58; *see also id.* R. 4.11, at 12; *id.* R. 14.1, at 53; *id.* R. 14.3, at 54.

critical to their business and because it blunts competition they might otherwise face without the MLS rules.

14. CLAW Rules 7.5 and 7.5.1 (collectively, the "Anticompetitive Rules") specifically block competition among brokers and agents, and homeowner choice. Rule 7.5 forces homeowners, brokers, and agents to give CLAW their listings and forces them into all of the CLAW restrictions: within two business days after all necessary seller signatures are obtained or the listing begins, whichever is later, the Broker Participant must either input any exclusive right to sell/lease or seller-reserved listing of one-to-four-unit residential property or vacant lots in CLAW's service area or submit a seller-signed exclusion. One of those restrictions, Rule 7.5.1, dictates how a homeowner can publicly market their property. Unless they give the listing to CLAW within one business day, homeowners and agents may not market the property to the public, which Rule 7.5.1 defines to include, without limitation, flyers displayed in windows, yard signs, digital marketing on public-facing websites, brokerage website displays (including IDX and VOW), digital communications marketing such as email blasts, multi-brokerage listing sharing networks, and applications available to the general public. Even though CLAW does not own the home or represent the homeowner, CLAW is dictating how the homeowner and their agent must sell the home.

15. The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS and marketed how CLAW directs. Every option CLAW offers comes down to the same choice: file the listing with CLAW and distribute it to competing subscribers within two business days, incurring the disadvantages described above, or not publicly market the home at all. Even an "MLS Exclusive (MX)" listing, which CLAW does not syndicate to IDX and third-party websites, must be filed with and distributed through CLAW from the start. No option lets a homeowner publicly market the home first and decide later whether and when to submit it to CLAW. Through these

rules, CLAW and its co-conspirators control how homeowners and agents market properties both on CLAW and outside CLAW. CLAW and its co-conspirators, thus, control home marketing across the entire real estate industry in much of Los Angeles County.

16. These rules stand directly in the way of competition. Compass has invested hundreds of millions of dollars in developing technology, competition with other brokerages for agents and clients, and innovative marketing strategies. If a homeowner chooses phased marketing, it proceeds in three phases. In the first phase, the homeowner chooses to publicly market the property via channels outside of the MLS, such as select internet websites, social media, newsletters, yard signs, word of mouth, or other techniques. Homebuyers do not need to work with a Compass agent to view these listings, and agents at other brokerages can view these listings on request. In the second phase, the listing is displayed on the Compass and Redfin websites as a "Coming Soon," and other agents can learn about the property from the MLS. In the third phase, the listing is published by the MLS to tens of thousands of websites and other data recipients.

17. Phase One is blocked, and Phase Two is severely restricted, by CLAW rules. Phase One listings cannot be publicly marketed, and Phase Two Coming Soon listings have significant restrictions on what the homeowner and agent can do. Specifically, CLAW states that even if the homeowner wants their agent to show buyers the property, the listing must first be submitted to CLAW, showings are allowed only to other real estate agents, no open houses are permitted, and any public-facing marketing must identify the listing as Coming Soon; and CLAW states that all Coming Soons must be restricted to 45 days, even if the homeowner wants their home listed as a Coming Soon for longer.[14]

---

[14] CLAW Rules R. 10.1(a), at 24; *id.* R. 10.1.1, at 25.

18. The phased marketing strategy has several advantages for homeowners. MLSs append to the listing (which is the ***homeowner's*** sales pitch to buyers) the history of price changes and days on market, which are perceived by buyers as signaling homeowner desperation. Having price changes and days on market in the homeowner's own advertisement often prevents homeowners from obtaining the full value of their property. This is unique to residential real estate: sellers of other goods are not forced to include, in their advertisements, price changes or how long the good has been for sale. By testing an aspirational price in a pre-MLS phase, homeowners may avoid the harms of unnecessary price cuts or days on the market being added by the MLS to the listing. Phased marketing also offers the chance to sell a house without the inconvenience and loss of choice that comes with listing it for sale through the MLS. In sum, phased marketing is good for some homeowners, good for agents seeking to represent those homeowners, and good for Compass. It does, however, threaten incumbents (that comprise and control CLAW) by forcing them to compete with Compass for homeowner clients, and to compete with Compass for agents who want a brokerage with innovative marketing strategies and choices they can offer to their clients.

19. This unreasonably restrains trade in two ways. CLAW's agent members, including a majority of its Board members, compete directly with one another and with Compass' agents for homeowners, and the Anticompetitive Rules block competition from brokers and agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC reported, "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[15] Moreover, CLAW is blocking competition

[15] Butters Report at 130.

between competing brokerages (the firms with which agents affiliate) to attract agents with innovative marketing strategies to win more clients.

20. A long history of antitrust enforcement shows why the Anticompetitive Rules violate the law. As recognized by the FTC, to comply with the antitrust laws, an MLS must give real estate brokers, agents, and homeowners true alternatives to the MLS—alternatives that existed in California for over 50 years.[16] For example, the "Fourteen Points" antitrust policy adopted in 1971 by the National Association of REALTORS® ("NAR"), whose mandated rule changes are automatically incorporated into CLAW's rules,[17] expressly provides that an "***MLS shall not: Make any rule regulating the advertising or promotion of any listing***,"[18] and preserves an alternative to the MLS, which it calls an "office exclusive."[19] On information and belief, before CLAW adopted Rule 7.5.1, CLAW had no restrictions on how office exclusives were publicly marketed. But today, CLAW requires every seller who chooses to keep a listing out of the MLS to sign a certification containing CLAW-mandated advisories warning that other agents and brokers and their buyers "may not be aware seller's property is for sale," and the "reduction in exposure of the listing may lower the number of offers made on the property and may adversely impact the overall price."[20]

21. The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings [like CLAW Rule 7.5]. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not

---

[16] *Id.* at 129–30.

[17] CLAW Rules R. 18, at 56 (rule changes mandated by NAR are incorporated automatically).

[18] Butters Report at 134 n.354 (emphasis added).

[19] *Id.* ("MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'").

[20] *See* CLAW Rules R. 7.6, at 17 (required seller advisories).

be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[21] The Anticompetitive Rules violate the Fourteen Points antitrust policy and cause the exact competitive injury about which the FTC warned. The DOJ commented on a policy similar to CLAW's Rule 7.5.1 that the "[p]olicy restrict[ed] home-seller choices and preclude[d] competition from new listing services."[22] The DOJ's comment echoed the FTC's 1983 conclusion that "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[23]

22. In short, under federal and state law, brokers and agents are entitled to offer, and consumers are entitled to choose from, more than the limited options that the actions of CLAW's combination of competitors have forced upon the industry. But CLAW blocks that choice and the competition that choice would bring.

23. CLAW and its co-conspirators have harmed brokers and agents including Compass, its agents, and homeowners. Compass is blocked from winning clients, from attracting agents, and from receiving commissions and other benefits that would come from its competition through innovative marketing strategies. Homeowners are hurt because they (1) cannot sell their own properties however they legally want, including in ways that test the market, and manage the sales process; (2) cannot benefit from marketing strategies that, on average, provide them with a 4.6% higher sale price, 34% fewer days on the MLS, and 29% fewer price cuts; and (3) cannot benefit from the fiduciary duties agents owe to their clients, including the duty of "utmost care, integrity, honesty, and loyalty."[24]

---

[21] Butters Report at 130.

[22] *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 954 (D.C. Cir. 2024) (discussing DOJ investigations).

[23] Butters Report at 130.

[24] Cal. Civ. Code § 2079.16.

24. CLAW has no valid justifications for its illegal conduct. Any claim CLAW makes is undermined by recent history: on information and belief, until 2020, CLAW allowed agents and their clients to market pre- and off-MLS without fines, CLAW succeeded, and homes were legally sold throughout much of Los Angeles County. Moreover, MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed, and homes are still sold legally. CLAW's restraints on competition are not about transparency, as some MLSs have claimed when defending similar rules. CLAW does not allow homeowners or homebuyers to become members or to directly search or access its database. CLAW does not accept for-sale-by-owner listings.[25] CLAW's own rules allow listings to be hidden, just as long as they are not publicly marketed outside of CLAW.[26] Its restraints also have nothing to do with free-riding. The free-riding justification was rejected by a federal appellate court in nearly identical circumstances.[27] Compass also gets nothing for free. Compass agents pay CLAW dues and contribute their listings to CLAW. Even when homeowners publicly market their properties pre-MLS, most would still instruct Compass to give their listings to the MLS before they sell (over 93% of all Compass listings, including listings publicly marketed pre- and off-MLS, are sold after being submitted to the local MLS).

25. On the other hand, CLAW's rules permit the MLS compilation—including Compass' listings—to be licensed "to any entity" on terms CLAW's Board approves. On information and belief, CLAW makes listings available to third-party portals and other companies that do not contribute any listings, and charges vendors an annual licensing fee for access to its IDX data.

---

[25] CLAW Rules R. 8.2, at 21.

[26] CLAW Rules R. 7.6, at 17.

[27] *Realcomp II, Ltd.*, 635 F.3d at 835.

26. Compass hereby brings claims against CLAW for violating Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, Cal. Bus. & Prof. Code § 16720 et seq.

## PARTIES

27. Plaintiff Compass, Inc. is a Delaware corporation with its principal place of business in New York, New York. Compass is an innovative, national real estate technology company and brokerage that provides a proprietary, end-to-end cloud-based platform for agents and their clients. Under the brand names "@properties," "Ansley Real Estate," "Better Homes & Gardens Real Estate," "Century 21," "Christie's International Real Estate," "Coldwell Banker," "Compass," "Corcoran," "ERA," "Latter & Blum," "Sotheby's International Realty," and "Washington Fine Properties," Compass operates brokerages and licenses franchises throughout the United States, including California. Compass empowers thousands of agents with cutting-edge technology to better serve homebuyers and homeowners. Compass also has title & escrow and mortgage joint-venture operations across the United States, including California.

28. Plaintiff Compass California, Inc. is a Delaware corporation that is licensed to, and does, operate as a real estate brokerage in California. Its regional headquarters is located at 9454 Wilshire Boulevard, Beverly Hills, California. Compass California, Inc. is a wholly owned subsidiary of Compass Brokerage, LLC, which in turn is an indirect wholly owned subsidiary of Compass, Inc.

29. Compass California, Inc. ("Compass California") is a Participant in CLAW, is the party to the listing agreements with Compass' homeowner clients in CLAW's service area, and is the entity against which CLAW enforces its rules.

30. Defendant CLAW is a California stock corporation with its principal place of business at 8350 Wilshire Boulevard, First Floor, Beverly Hills, California 90211.[28]

[28] *Business Search*, Cal. Sec'y of State, Combined L.A./Westside MLS, Inc.

CLAW serves more than 16,000 real estate professionals, in addition to agents, brokers, and appraisers who have direct access to CLAW records via data share agreements with other MLSs, including California Regional Multiple Listing Service, Inc. ("CRMLS") and San Diego MLS. A majority of the members of CLAW's Board of Directors are working brokers and agents who compete with each other and Compass and its agents.

31. CLAW is a contract, combination, or conspiracy of competing agents and brokers. CLAW's participating brokers and agents compete directly with one another and with Plaintiffs for homeowner clients, homebuyer clients, and agents. Those brokers and agents follow and enforce CLAW's rules, and CLAW is governed by a Board of Directors dominated by competing brokers and agents.

32. CLAW Rule 7.7 provides that CLAW's "service area" is determined by CLAW, subject to approval by its Board of Directors; as shown on CLAW's published area map, that service area covers much of Los Angeles County, including Los Angeles' Westside, much of central Los Angeles, and portions of the San Fernando Valley, including but not limited to Beverly Hills, Bel Air, Brentwood, Westwood, Century City, West Hollywood, Venice, Marina del Rey, Playa Vista, Hollywood, Los Feliz, Silver Lake, Echo Park, Downtown Los Angeles, and Malibu.[29]

## CLAW'S CO-CONSPIRATORS

33. Competing agents, including those enforcing CLAW's rules, members of CLAW's Board of Directors, and members of the hearing panels that hear rule violations, conspired with each other, with CLAW, and with CLAW's shareholder-association owners (the "Shareholder Associations") to design, approve, enforce, and implement the Anticompetitive Rules. On information and belief, the

[29] CLAW Rules R. 7.7, at 17; 2020 MLS/CLAW Area Map, The MLS™/CLAW, https://www.themls.com/vestamapareas/.

Shareholder Associations select or influence the selection of CLAW's Board of Directors. On information and belief, CLAW is owned by three shareholders: Greater Los Angeles Association of REALTORS® ("GLAR"), Malibu Association of REALTORS®, and Southwest Association of REALTORS®. CLAW identifies every one of its 2026 officers and directors by affiliation with one of the three Shareholder Associations: its President, President-Elect, Treasurer, and four other directors are affiliated with the Greater Los Angeles Association of REALTORS®; two directors with the Malibu Association of REALTORS®; and its immediate Past President and one other director with the Southwest Association of REALTORS®.[30] GLAR itself solicits applications from its members to serve on "The MLS™ (CLAW) Board of Directors."[31] CLAW's rules further reflect CLAW's ties to the REALTOR® associations that own it. They vest copyright in each MLS compilation in the Association of REALTORS® ("A.O.R.") with "the right to license such compilations . . . to any entity." They reserve to "the A.O.R." the decision "whether to provide Internet advertising services." They require members of the same Association of REALTORS® to arbitrate their disputes at that Association. And they permit CLAW to charge agents who are not members of "a Realtor® association that owns the MLS" "a different amount," provided it is "reasonably related to the actual costs of serving those members."[32]

34. CLAW's co-conspirators also include the other MLSs with which CLAW shares its listing data and its rules, including CRMLS and San Diego MLS. Under

---

[30] *2026 The MLS™/CLAW Officers, Directors & Staff*, The MLS™/CLAW, https://www.themls.com/boards.cfm?tab=.

[31] Greater Los Angeles REALTORS®, *Shape the Future of the Industry by Serving on The MLS (CLAW) Board of Directors* (Sept. 14, 2026), https://greaterlarealtors.com/shape-the-future-of-the-industry-by-serving-on-the-mls-claw-board-of-directors/.

[32] CLAW Rules R. 11.6, at 28; *id.* R. 12.16.3, at 44; *id.* R. 16.3, at 54–55; *id.* R. 4.1.1, at 8.

CLAW Rule 6 and the corresponding rules of those MLSs, CLAW and its data-share partners give one another's participants and subscribers access to their listings, and each MLS's participants and subscribers agree to abide by the other MLSs' rules when their listings are received and published by, or when they access, those MLSs. On information and belief, CLAW is also a party to a regional "Cross Pollination Agreement" with other California MLSs, including CRMLS, MLSListings®, the Bay East Association of REALTORS®, the Contra Costa Association of REALTORS®, and bridgeMLS, under which each organization's listing data is displayed in the MLS systems of the others. CRMLS and San Diego MLS require their participants to submit listings, and restrict public marketing, on terms the same as or broader than the Anticompetitive Rules.[33]

35. CLAW's co-conspirators performed acts and made statements in furtherance of CLAW's anticompetitive conduct. CLAW is jointly and severally liable for the acts of its co-conspirators, whether or not they are named as defendants in this complaint.

## JURISDICTION AND VENUE

36. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Compass brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking injunctive relief, damages, treble damages, cost of suit, and reasonable attorneys' fees, arising from CLAW's and unnamed co-conspirators' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. This Court has supplemental jurisdiction over Compass' state-law claim (Count III) under 28 U.S.C. § 1367(a) because that claim is so related to Compass' Sherman Act

[33] CLAW Rules R. 6, at 14; CRMLS, Rules & Policies R. 6, at 13 (eff. July 10, 2026) ("CRMLS Rules"); *id.* R. 7.8–7.9.1, at 15–17; San Diego MLS, Rules & Regulations R. 6, at 16 (July 2026) ("SDMLS Rules"); *id.* R. 7.5–7.6, at 19–21; Bay East Ass'n of REALTORS®, MLS Rules and Regulations § 6.1, at 13 (eff. Oct. 26, 2026).

claims that it forms part of the same case or controversy under Article III of the United States Constitution.

37. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

38. This Court has personal jurisdiction over CLAW because its headquarters and principal place of business are in this district, and CLAW conducts substantial business in this district.

39. Venue is appropriate in this district and in the Western Division because CLAW's headquarters and principal place of business are in this district and because a substantial portion of the transactions and events giving rise to this action—the agreement among the competing brokerages and the actual and threatened enforcement of anticompetitive rules—occurred in this district. 28 U.S.C. § 1391; 15 U.S.C. § 22. CLAW was organized as a California stock corporation in 1992 and lists its principal office in this district in its filings with the California Secretary of State.

## TRADE AND COMMERCE

40. CLAW has entered into agreements with each of its thousands of Participants and Subscribers, each of whom must agree to abide by CLAW's MLS rules. Those brokers and agents use the CLAW MLS to market and sell thousands of residential homes and condominiums each year, with total closings valued in the billions of dollars. These transactions, together with the associated mortgage financing, out-of-state buyers and homeowners, and national title insurance, are in and have a substantial effect on interstate commerce, as used in 15 U.S.C. § 1.

## RELEVANT MARKETS

41. Relevant Product Markets. There are at least three relevant product markets: (1) provision of real estate brokerage services to homeowners (the "Brokerage Services Market"); (2) provision of real estate brokerage services to agents who represent homeowners (the "Agent Services Market"); and (3) provision of multiple

listing services to brokers and agents who represent homeowners (the "MLS Market") (collectively, the "Relevant Markets").

42. The Brokerage Services Market includes the services that brokerages and agents provide their homeowner clients. Those services include, among other things, advising on pricing and marketing, conducting marketing activities, and negotiating with buyers. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of brokerage services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages and agents who participate in and control CLAW compete in the Brokerage Services Market.

43. The Agent Services Market consists of services that brokerages provide to agents. Those services include, among other things, sharing commissions with the agent, developing and maintaining a strong brand that appeals to consumers, investing in and providing technology agents can use in representing clients, and supporting agents in representing their clients, including by offering innovative and appealing ways to better serve their clients. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of agent services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages who participate in and control CLAW compete in the Agent Services Market.

44. The MLS Market consists of the services that MLSs provide to brokers and agents. Those services include a repository of property listings, distribution of listings to other agents, and syndication of those listings through data sharing feeds to other participants, including the other real estate brokers and agents in the area and the large public-facing aggregator websites such as third-party portals. A hypothetical profit-maximizing firm, not prevented by regulation from increasing

prices or worsening terms, that was the only present and future seller of multiple listing services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. CLAW participates in the MLS Market.

45. **Relevant Geographic Market.** The relevant geographic market for each of the defined product markets is no larger than CLAW's service area, as determined under CLAW Rule 7.7 and depicted in CLAW's published area map (the "CLAW service area"). A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of each of the relevant products in this geographic market likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms.

46. Brokers and agents cannot avoid CLAW's rules by using a neighboring MLS or an MLS with a data sharing agreement with CLAW for several reasons:

a. Brokers and agents need to be members of the MLS that covers their region because being an "out-of-region" broker or agent makes it harder to attract clients and agents.

b. CLAW Rule 6 authorizes CLAW to enter into regional or reciprocal agreements giving other MLSs' participants and subscribers access to CLAW, and provides that "Participants and Subscribers agree to abide by the respective rules of the other MLSs receiving and publishing a listing pursuant to such agreements and to abide by such rules when accessing the other databases or datasets." CLAW's data-share partners have the same rule. CRMLS Rule 6 and San Diego MLS Rule 6 each provide that their participants and subscribers "agree to abide by the respective rules of the other MLSs receiving and publishing a listing pursuant to such agreements" and to abide by those rules when accessing the other MLSs' databases. As a result, a CRMLS or San

Diego MLS member whose listing CLAW receives and publishes, or who accesses CLAW's database, must abide by CLAW's rules—and a CLAW member must abide by CRMLS's and San Diego MLS's rules in the same circumstances.[34]

c. CLAW Rule 7.7 provides that if CLAW has entered into regional MLS agreements or a regional MLS corporation with other MLSs and has enlarged its service area as part of the agreement or corporation, submission of listings is mandatory for the combined service areas of the signatory associations. CLAW has data share agreements with other MLSs, including CRMLS and San Diego MLS, and, on information and belief, CLAW enlarged its service area as part of those agreements.[35] CRMLS's rules go further: CRMLS's service area automatically includes "the entire county that contains any of the territorial jurisdiction of . . . any data share partner AOR/MLS," which encompasses the CLAW service area, and CRMLS requires its participants to input every exclusive right-to-sell or seller-reserved listing of one-to-four-unit residential property or vacant lots in its service area.[36] Both of these MLSs have rules that are the same as, or broader than, CLAW's public-marketing restraint. CRMLS requires submission within one business day of marketing a listing to "any member of the public," including through "communications (verbal or

---

[34] CRMLS Rules R. 6, at 13; SDMLS Rules R. 6, at 16.

[35] *About*, The MLS™/CLAW, https://www.themls.com/explore/about; *see* First Am. Compl. ¶ 34, *Cal. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-cv-08796-MKV (S.D.N.Y. Oct. 27, 2026), ECF No. 13 (alleging reciprocal data-sharing agreement between CRMLS and CLAW); *Data Sharing and Guest Access*, San Diego MLS, https://sdmls.com/members/neighboring-mls-information/ (listing The MLS/CLAW as a data sharing partner).

[36] CRMLS Rules R. 7.8, at 15–16; *id.* R. 7.10, at 17.

written)" or "by conducting an open house," and a seller who keeps a listing off CRMLS must instruct the listing broker in writing "to do no marketing or advertising." San Diego MLS likewise requires submission within one business day of public marketing, which it defines to reach "anyone outside the broker(s) and agent(s) licensed within a single listing brokerage and their clients," including "conducting an open house," and it limits an off-MLS "Office Exclusive Listing" to private, one-on-one communications.[37]

d. CLAW rules apply to all agents and listings affiliated with a "Broker Participant," which means that every listing by an agent affiliated with a brokerage must be given to CLAW, even if the agent is not a member of CLAW, does not submit it to CLAW, and the homeowner does not want it in CLAW. Even if the brokerage has only a single agent who needs to access CLAW, the entire brokerage must become a member, unless the other agents work out of a separate branch office that does not use CLAW. Specifically, Rule 7.5 imposes the submission obligation on the Broker Participant; Rule 4.6 extends every rule directed at the listing broker to "a licensee retained by the listing broker" and provides that doing so "shall not relieve the listing broker of responsibility for the act or rule specified"; and Rule 4.4 requires each Participant to identify to CLAW every licensee affiliated with the Participant or the Participant's firm. Rule 5.1.2 then sets each Broker Participant's recurring fee as "an amount times the total number of (1) the Broker Participant plus (2) the number of salespersons who have access to and use of the MLS . . . employed by or affiliated . . . with

[37] CRMLS Rules R. 7.8, at 15–16; *id.* R. 7.9, at 16; *id.* R. 7.9.1, at 16–17; SDMLS Rules R. 7.5, at 19–20; *id.* R. 7.6, at 20–21.

such Participant or the Participant's firm," and Rule 5.1.5 imposes a computer access fee "equal to the total number of Subscribers and Salespersons . . . employed by or affiliated as independent contractors with such Participant." A Participant can avoid paying for a licensee only by certifying in writing that the licensee is engaged solely in activities that do not require a license or "will not use the MLS or MLS compilation in any way," on pain of back fees and sanctions.[38] Thus, if one agent in a brokerage needs CLAW access, then all agents in that brokerage (other than agents in a separate branch office that does not use CLAW) are bound by CLAW's rules.

47. To serve their clients and compete in the CLAW service area, brokers and agents must have access to CLAW and follow CLAW's rules. Thus, in both the Brokerage Services Market and the Agent Services Market, the brokers and agents that combine to adopt, follow, and enforce the CLAW rules collectively have market power. In the MLS Market, CLAW has market power.

48. As the DOJ has alleged, "By virtue of industry-wide participation and control over a critically important input, the MLS (a joint venture of competing brokers) has market power in almost every relevant market."[39] And, as the DOJ and FTC reported, "[a]s the primary source of information about homes currently for sale and the prices at which other, comparable homes have been sold, the MLS is an extraordinarily important resource for sellers, buyers and brokers. . . . MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS."[40]

---

[38] CLAW Rules R. 5.1.2, at 12–13; *id.* R. 5.1.6, at 13.

[39] Am. Compl. ¶ 24, *United States v. Nat'l Ass'n of Realtors*, No. 05-C-5140 (N.D. Ill. Oct. 4, 2005), reprinted in 73 Fed. Reg. 36,104, 36,105 (June 25, 2008).

[40] DOJ & FTC, Competition in the Real Estate Brokerage Industry 12 (Apr. 2007) ("2007 DOJ/FTC Report"), available at https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-

## FACTUAL ALLEGATIONS

**MLSs and the Antitrust Laws**

49. An MLS aggregates listings submitted by participating agents into a common database and makes the resulting data available to MLS participants and subscribers. CLAW is in the business of operating a broker cooperative by:

a. enhancing cooperation among its Participants;

b. accumulating and disseminating information to enable Participants to prepare appraisals, analyses, and other valuations of real property for clients and customers;

c. maintaining common databases to which Participants engaged in real estate appraisal contribute;

d. serving as a facility for the orderly correlation and dissemination of listing information among Participants; and

e. licensing its MLS compilations to third parties.[41]

50. MLSs also make and enforce rules. CLAW staff issue citations for violations of CLAW's mandatory-submission rules—including failing to timely submit a required listing and exceeding the permissible scope of an office exclusive—under the fine schedule in CLAW's Model Citation Policy, and the MLS Committee or Board may instead charge violations through a disciplinary hearing.[42] On information and belief, for violations of its Clear Cooperation Policy, CLAW fines the agent with penalties escalating from a warning and mandatory "Compliance Class" to a $2,500 fine, a $5,000 fine, and then a "Hearing & Suspension of MLS

---

brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf.

[41] *See* CLAW Rules R. 2, at 7; *id.* R. 11.6, at 28.

[42] *See* CLAW Rules R. 14.3, at 54; Model Citation Policy § I, at 58; *id.*, Tier Two Offenses ¶¶ 2–3, at 60.

Access."[43] CLAW contemplates that competing agents will help enforce its rules: Its Model Citation Policy promises that "[r]eporting of violations will remain confidential" and requires CLAW to "provide a process for processing reports of violations without revealing the complainant's identity," and, if the matter is forwarded to hearing, requires the MLS Committee, Grievance Committee, MLS staff, or other representative to serve as complainant when the reporting agent does not consent to being identified.[44] CLAW also polices listings itself, marketing an in-house "Checkmate Listing Violation Detection™" product.[45]

51. In addition to operating this members-only database, some MLSs sell agent and homeowner data to third parties, such as real estate web portals and technology vendors, which monetize it in various ways, *e.g.*, selling leads for potential buyers to agents by displaying the data on websites with advertising alongside, and by creating tools to recruit agents from brokerages. For example, CRMLS—one of CLAW's data-share partners—co-founded REdistribute, which sells MLS data to lenders, insurers, and other institutional buyers.[46] CLAW's rules permit the MLS compilation—including Compass' listings—to be licensed "to any entity" on terms CLAW's Board approves.[47] On information and belief, CLAW makes listings available to third-party portals and other companies that do not contribute any listings, and charges vendors an annual licensing fee for access to its IDX data. A listing broker may opt out of Internet advertising of its listings, but only at a cost: a broker that withholds its listings from IDX display on a blanket basis forfeits the right to display other brokers' active listings on its own website.[48] And there is no

[43] Data Integrity Standards, Tier Four, at 14.

[44] Model Citation Policy § J, at 58.

[45] *About*, The MLS™/CLAW, https://www.themls.com/explore/about.

[46] *See REdistribute*, CRMLS, https://go.crmls.org/redistribute/.

[47] CLAW Rules R. 11.6, at 28.

[48] CLAW Rules R. 12.16(b), at 40; *id.* R. 12.16.3, at 44.

opt-out at all from the "Brokerage Back Office Data" feed, through which CLAW must give every competing brokerage, and any vendor it designates, "all real property listing and roster information in the MLS database, including all listings of all Participants."[49]

52. Brokerages that have adopted the traditional, mutually aligned business model of real estate sales rely passively on one another to provide their listings to each other via the MLS. MLSs that are comprised of or governed by brokerages and agents with traditional business models have a strong financial incentive to impair the business models of innovators and mavericks who seek to offer marketing options to homeowners that eschew immediate and automatic sharing of their listings on the MLS regardless of the circumstances or preferences of the homeowner. Such MLSs, and the traditional brokerages and agents that control them, try to prevent their members from publicly marketing properties off-MLS, because publicly marketing off-MLS presents a competitive challenge to the traditional brokerages.

53. MLSs are private companies. Unlike agents, MLSs do not owe fiduciary duties to anyone, let alone consumers. They are not government entities or law enforcement agencies, even though they pretend to have similar powers when interacting with agents. MLSs are not inherently pro-consumer, pro-competitive institutions; they are organizations of competing agents that make rules governing competition among them. MLSs enforce those rules by fining and punishing members.

54. As such, MLSs and their rules have long been regarded warily by courts and antitrust enforcers. When competitors "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[50] As the FTC wrote, control

[49] *See* CLAW Rules R. 11.15, at 31.

[50] *Realty Multi-List*, 629 F.2d at 1370.

over the MLSs gives "Realtor groups the single most powerful tool available for shaping brokerage practice."[51] That control has been used in the past to do things like set commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

55. In the 1940s, the DOJ brought civil and criminal charges against MLSs that fixed commission rates.[52] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[53] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[54]

56. Recognizing the pro-competitive benefits of pre-MLS marketing strategies is consistent with the federal antitrust agencies' long-standing views of the real estate markets. "[T]he Agencies . . . have challenged, as antitrust violations, MLS rules that unreasonably restrict competition by brokers who use alternative business

---

[51] Butters Report at 92–93.

[52] *See Nat'l Ass'n of Real Est. Bds*., 339 U.S. at 487.

[53] *Realcomp II, Ltd.*, 635 F.3d at 819.

[54] *Consol. Multiple Listing Serv., Inc.*, 2009 WL 3150388, at *2.

models."[55] For example, the DOJ and FTC have brought cases ensuring that discount brokers and fee-for-service brokers were not denied MLS access.[56]

57. This history is long-standing and specific. On behalf of all its affiliated MLSs, NAR addressed this antitrust problem in 1971. As the FTC explained:

> By the late 1960's and early 1970's, MLSs had been named in a number of private antitrust actions and Justice Department investigations. Justice Department investigations culminated in 15 consent orders banning price fixing and other alleged anti-competitive activities. In response to these legal problems, the National Association of Realtors developed and enforced a list of policy points.[57]

58. NAR's November 15, 1971, statement, setting out and mandating these policies on the Realtor MLSs, is referred to in the industry as the "Fourteen Points" antitrust policy. Point 11 of the policy specifically addressed the antitrust problem caused by mandatory submission rules by guaranteeing an alternative method of selling residential properties to the MLS: the "office exclusive."[58] Specifically, the antitrust policy expressly provided that "***MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'***"[59] Point 10 provided that "***MLS shall not: Make any rule regulating the advertising or promotion of any listing.***"[60] The FTC found that the

---

[55] 2007 DOJ/FTC Report at 63; *see also Realty Multi-List*, 629 F.2d 1351*; Realcomp II*, 635 F.3d 815.

[56] 2007 DOJ/FTC Report at 64 (describing and citing cases).

[57] Butters Report at 109.

[58] *Id.* at 130.

[59] *Id.* at 134 n.354 (emphasis added).

[60] *Id.* (emphasis added).

Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[61] The term "office exclusive" just meant the listing was not provided to the MLS, and on information and belief, before CLAW adopted Rule 7.5.1, a homeowner who excluded her listing from the MLS was not restricted in how the listing was publicly marketed. CLAW's mandatory submission rules cannot possibly comply with the antitrust laws because agents and homeowners have no freedom to avoid CLAW's restrictions or market their homes how they choose under the Anticompetitive Rules.

**The Anticompetitive Rules**

59. CLAW's rules are approved by its Board of Directors, a majority of whom are working brokers and agents who compete with Compass and its agents. Rule 18 provides that CLAW's rules may be amended by a two-thirds vote of its MLS Committee, subject to approval by the Board of Directors, and that rule changes mandated by NAR are incorporated automatically. Alleged rule violations are heard by a hearing panel under the California Code of Ethics and Arbitration Manual (the "Manual"), after which the Board of Directors may impose discipline.[62] Under the Manual, the President appoints the members of the Professional Standards Committee, subject to confirmation by the Board of Directors, and the Committee's Chairperson selects from that Committee a hearing panel of at least three members to hear alleged MLS rules violations.[63] If party challenges leave too few panelists,

---

[61] *Id.* at 130.

[62] CLAW Rules R. 14.1, at 53; *id.* R. 15, at 54.

[63] Cal. Ass'n of REALTORS®, California Code of Ethics and Arbitration Manual, at 8 §§ 10(a)–(b), 19 §§ 28(e)–(f) (Jan. 1, 2026), *available at*

the President may appoint other members to fill the panel.[64] A respondent who wishes to challenge the decision may request review only by the Board of Directors or a review panel of the Board, which the President selects, and only on limited grounds; no new evidence on the merits may be presented.[65] The Board's decision is final: each member agrees "not to seek review in any court of law," and the California Association of REALTORS® "does not review and cannot overturn" it.[66] At every stage, then, CLAW's rules are enforced by brokers and agents chosen by CLAW's own leadership.

60. Rule 7.5 provides that, within two business days after all necessary seller signatures are obtained or the listing begins, whichever is later, the Broker Participant must either input any exclusive right to sell/lease or seller-reserved listing of covered residential property in CLAW's service area, or submit a seller-signed exclusion under Rule 7.6. Rule 7.5.1 dictates how homeowners can publicly market their properties. Unless they give the listing to CLAW within one business day, agents and homeowners may not market the property to the public, which Rule 7.5.1 defines to include, without limitation, "flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public." Rule 7.6 applies the same one-business-day requirement to listings the seller has excluded from CLAW once those listings are publicly marketed. The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS.

---

https://sacrealtor.org/wp-content/uploads/2026-California-Code-of-Ethics-and-Arbitration-Manual.pdf.

[64] *Id.* at 20 § 28(j).

[65] *Id.* at 24–27 §§ 38(a), (c), (h), (j), (p), (s).

[66] *Id.* at 27 §§ 38(v), (w).

61. If a CLAW Participant violates CLAW's rules, CLAW can punish the real estate agent and/or brokerage by levying fines or blocking their access to the listings database.[67] Under CLAW's 2024 Citation Policy, which on information and belief CLAW continues to apply, a violation of the Clear Cooperation Policy embodied in CLAW Rule 7.5.1 is a "Tier Four" offense for which the agent, not the broker, is fined: a warning and a mandatory compliance class for a first offense, $2,500 for a second, $5,000 for a third, and a hearing and suspension of MLS access for a fourth, with violations accumulating over a three-year period.[68] CLAW sends notice of a violation, which must be corrected within two business days; the fine is due within fifteen business days; an agent who believes a citation was issued in error must correct the violation before requesting a hearing; and a Participant or Subscriber who disputes the amount owed must pay it in full before obtaining a hearing.[69] CLAW's Model Citation Policy also gives CLAW discretion to proceed by hearing, with the possibility of "additional fees or fines, suspension or expulsion," up to an accumulated fine of $15,000 for a single violation.[70] CLAW polices its rules, as do CLAW's members.

**See It First™ on Compass**

62. A homeowner may decide to submit a property listing immediately to the MLS for distribution. Alternatively, a homeowner may decide to engage in one or more public marketing strategies that precede distribution through the MLS. These pre- and off-MLS strategies may take a number of different forms. "Office exclusives" are a long-standing practice of publicly marketing a property off the

---

[67] CLAW Rules R. 14.1–14.3, at 53–54.

[68] 2024 Citation Policy § L (Tier Four); *see also* Data Integrity Standards § II (describing the Clear Cooperation Policy's one-business-day submission requirement).

[69] 2024 Citation Policy §§ D, F, G; CLAW Rules R. 17.2, at 56.

[70] Model Citation Policy §§ I, K, at 58–62.

MLS. Another alternative is a "Coming Soon" listing, where a listing is available to other participants in the MLS and may be posted to an agent's website or to other selected websites.

63. Compass is an innovative, technology-forward real estate brokerage. From its founding in 2012, Compass has invested in and developed pre- and off-MLS marketing strategies. These marketing strategies allow homeowners to choose effective options to meet their goals. Today, Compass refers to these strategies under its "See It First™ on Compass" umbrella; a prior version was called Compass' 3-Phased Marketing Strategy. Compass agents offer See It First™ on Compass to clients where MLS rules permit it, although CLAW impedes that competition to protect its members, who are Compass' competition.

64. Compass agents always discuss the advantages and disadvantages of immediate MLS distribution and phased marketing with the homeowner. The homeowner decides what to do. When working with a Compass agent, a homeowner who opts to use See It First™ on Compass as a strategy signs disclosures[71] acknowledging that the listing will not initially appear in the active MLS feed.

65. In the first phase of See It First™ on Compass, agents do not list the property on the MLS but publicly market listings in every off-MLS way allowed by local MLS rules, including informing viewers on Compass' website that (unspecified) off-MLS listings exist in the area in which the user is searching. A prospective buyer need not hire a Compass agent, or any agent, to learn about or obtain access to these listings. A buyer may contact a Compass office directly, ask a non-Compass agent to contact Compass, or register on their own without charge. Agents at other brokerages also can view these listings on request.

66. In the second phase of See It First™ on Compass, the listing moves to a "Coming Soon" status. If the homeowner instructs the agent to do so, Compass

[71] These disclosures are available at https://www.compass-homeowners.com.

advertises “Coming Soon” listings on its own website and also distributes them to Redfin.com, a third-party real estate site, which combined have over 50 million monthly active users. Coming Soon status signals to prospective buyers that the property will soon become active on the MLS and allows the homeowner to gather valuable feedback about the property before that point.

67. Finally, after these first two phases, the property moves to the third phase and goes active on the MLS and is sent by the MLS to tens of thousands of internet websites and data vendors. The homeowner and agent benefit from the pre-MLS phases because they will have provided insight on pricing, staging, and marketing strategy. Some listings sell before reaching broad MLS distribution, but more than 93% continue to the third phase, listing on the MLS.

68. The listing is the homeowner’s advertisement for the home. Like any seller of property, the homeowner is entitled to say whatever they want in the listing to sell the home so long as the listing complies with the law. And, just like a seller of anything, a homeowner should not be forced to put things into their advertisement that hurt the homeowner unless required by the law. A homeowner should not be forced to tell a buyer all the ways that the buyer can negotiate against the homeowner. But the MLS displays information that forces the homeowner’s advertisement—the listing—to contain things that are not required by the law and that no reasonable homeowner would want in their listing, including days on market and history of price changes.

69. The phased marketing strategy has several advantages for homeowners.

a. First, because MLSs put the history of price changes onto the listing, and price cuts are perceived by buyers as signaling desperation, homeowners often forgo asking a higher price at the outset to avoid the risk of having to cut the price and reduce their bargaining leverage relative to buyers. This can prevent homeowners from obtaining the full value of their properties. By testing an aspirational price in a pre-MLS

phase, homeowners may obtain a higher price with less risk of a price cut later. A pre-MLS listing also avoids third-party aggregators applying their own flawed pricing algorithms to public listings, which could reduce the amount potential buyers might offer for the property.

b. Second, because off-MLS pre-marketing reduces the risk to homeowners of attempting to market their property before making costly upgrades, renovations, cosmetic improvements, professional photographs, or other investments, off-MLS pre-marketing can save the homeowner the costs of making such investments.

c. Third, MLSs publish the number of days a listing has been on the MLS, and a higher number is likewise perceived by buyers as increasing their bargaining leverage relative to sellers. Pre-MLS marketing allows homeowners to test the market, build buyer interest, and refine their strategy without incurring days on the market.

d. Fourth, pre- and off-MLS marketing offer the chance to sell a house without the inconvenience that comes with publicly listing it for sale and offer the chance to assess whether expensive renovations are necessary to make the house more attractive to the broader market. Indeed, a homeowner may not yet be fully convinced that they want to sell the property or may want to avoid disruptive showings.

70. See It First™ on Compass offers homeowners the ability to market a property prior to full preparation, which may allow homeowners to reduce or avoid the costs, time, and risks associated with pre-sale improvements, while retaining the option to accept or decline early offers. Indeed, reported transactions are consistent with these benefits. For example, a homeowner experiencing a time of distress needed to sell her property quickly and was able to secure a buyer within a short period, without dimensions or even pictures through pre-marketing. Compass agents appreciate the ability to offer innovative strategies that help homeowners achieve their goals. For

example, a Compass agent who had briefly joined a competing brokerage returned to Compass, expressing excitement about See It First™ on Compass.

71. This phased marketing strategy is good for homeowners, good for agents seeking to represent homeowners, and good for Compass. Compared with listings sent directly to an active MLS feed, properties marketed through Compass' phased marketing strategy sold for 4.6% more, had 34% fewer days on the MLS, and experienced 29% fewer price cuts. The phased marketing strategy does, however, threaten incumbent brokerages by forcing them to compete against Compass for homeowner clients and for agents who want to offer such innovative marketing strategies to their homeowner clients.

72. Homeowner demand for phased marketing has been substantial in the many areas of the country where MLSs allow Compass to offer it. By March 2025, approximately 48% of Compass homeowners selected phased marketing. After March 2025, the percentage of phased marketing listings fell due to Zillow's adoption of "Listing Access Standards" banning pre-marketed listings from Zillow and affiliated sites. The Listing Access Standards are similar to CLAW's Rule 7.5 and Rule 7.5.1 in that they deny access to a public marketing platform, in that case Zillow's, based solely on the homeowner's decision to first market a property by other means. In a recent federal antitrust case, Zillow argued that its Listing Access Standards promoted competition by reducing pre-MLS marketing, but the court held both that Zillow failed to prove its claims and that the "record . . . identifie[d] plausible procompetitive effects from" strategies such as Compass' phased marketing strategy.[72]

73. Recognizing the benefits of pre- and off-MLS marketing for many homeowners, many MLSs do not penalize agents and homeowners for such

[72] *Zillow Group, Inc. v. Midwest Real Est. Data LLC*, No. 1:26-cv-05451, Mem. Op. & Order 43–44 (N.D. Ill. Sept. 15, 2026), ECF No. 141.

marketing. MLSs serving more than 350,000 brokers and agents in at least 12 states allow homeowners to publicly market their properties, and those MLSs continue to succeed.

**Anticompetitive Effects**

74. The Anticompetitive Rules restrain trade in several ways.

a. ***First***, because CLAW's participating brokers and agents (including a majority of its Board members) compete directly with one another and with Compass and its agents for homeowners and homebuyers, implementation and enforcement of the Anticompetitive Rules block competition from agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC reported, "On its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[73]

b. ***Second***, CLAW is blocking competition by other public marketing methods, identified by CLAW Rule 7.5.1 as including flyers displayed in windows, yard signs, digital marketing on public-facing websites, brokerage website displays (including IDX and VOW), digital communications marketing such as email blasts, multi-brokerage listing sharing networks, and applications available to the general public, and most significantly, the Compass website itself.

c. ***Third***, the Anticompetitive Rules also reduce competition among brokers, including Compass, by preventing them from competing through the timing, sequence, and scope of a listing's distribution.

[73] Butters Report at 130.

d. ***Fourth***, the Anticompetitive Rules further reduce competition among brokers, including Compass, by preventing them from competing to attract agents by offering them innovative, appealing ways to serve their homeowner clients.

**CLAW's Justifications Are Pretextual**

75. CLAW has no valid justification for its illegal conduct. On information and belief, CLAW operated without such rules before 2020, and many MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed. These rules are not required for operating a successful MLS. These are not rules that ensure the integrity of the data distributed by CLAW or prohibit its members from selectively editing or excluding the CLAW listings they show their buyer clients. The Anticompetitive Rules govern marketing itself and require brokers and their clients to forgo profitable strategies on pain of being fined by or excluded from the MLS.

76. CLAW's restraints on competition are not about transparency. CLAW does not allow homeowners or homebuyers to become members. CLAW does not accept for-sale-by-owner listings. And CLAW's own rules allow listings to be hidden, just as long as they are not publicly marketed.[74] Nor are CLAW's restraints about equal access for buyers; any buyer, and any buyer's agent, can learn about, tour, and make an offer on a property marketed through See It First™ on Compass without hiring a Compass agent. Indeed, without See It First™ on Compass as an option, some homeowners would not choose to sell their property, ultimately reducing the inventory of homes on the market.

77. CLAW's restraints also have nothing to do with "free-riding." Other MLSs—including one of CLAW's data-share partners, CRMLS, in declaratory-judgment actions filed against Compass in October 2026—have accused Compass of seeking

[74] *See* CLAW Rules R. 7.6, at 17.

to "free ride" on the MLS by participating when it chooses but otherwise withholding listings from the MLS.[75] That is nonsense. In the first place, Compass does not seek special treatment. If Compass has its way, ***every*** member of CLAW will be free to offer pre- and off-MLS marketing strategies to their clients.

78. Compass does not benefit from the contributions of other brokerages to the MLS without contributing to the benefits that other brokerages can obtain from the MLS. Compass contributes substantially to the benefits obtained by other brokerages and would continue to do so under the See It First™ on Compass program. Compass agents provide value to CLAW and its members in critical ways, including by paying dues, exposing their buyer clients to listings submitted by other members and submitting listings to CLAW for the benefit of all buyer agents in the CLAW service area after the first two phases of the phased marketing strategy, which would happen for over 93% of all pre-marketed listings based on experience elsewhere.

79. In its rules, CLAW asserts other arguments about the purported drawbacks of pre- and off-MLS marketing that amount to little more than paternalistically telling homeowners and their agents what is best for them. For example, CLAW requires a seller who withholds a listing from CLAW to sign an advisory warning that the reduced exposure may lower the number of offers and adversely affect the sale price.[76] Competition requires innovation, and consumers will ultimately decide what innovations are worthwhile.

80. CLAW's purported alternatives do not cure the restraint. CLAW Rule 7.6, which governs listings a seller excludes from CLAW, requires the listing broker to submit even an excluded listing to CLAW "within (1) one business day once the

---

[75] *See* First Am. Compl., *Cal. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-cv-08796-MKV, ¶¶ 9, 71 (S.D.N.Y. Oct. 27, 2026), ECF No. 13.

[76] CLAW Rules R. 7.6, at 17 (requiring that any seller who declines to list their home on the MLS be advised that decision "may lower the number of offers made on the property and may adversely impact the overall price").

listing is publicly marketed"—so a single yard sign, window flyer, website posting, or email blast (each "public marketing" under Rule 7.5.1) forces the listing into CLAW. Under CLAW's "MLS Exclusive" (MX) status, a broker can share a listing "with MLS members only" for as long as the listing lasts, without syndicating it to third-party websites and without recording days on market or price history until the home sells.[77] But MX is a status within CLAW: to use it, the homeowner must still hand the listing to CLAW and expose it to every one of CLAW's more than 16,000 competing agents and brokers. It therefore offers nothing to the homeowner who wants to test the market—before, or instead of, sharing the listing with CLAW's entire membership—through the listing brokerage's own channels, which is precisely the choice Rule 7.5.1 forecloses. CLAW's Coming Soon status is limited to 45 days, prohibits open houses, and permits showings only to other agents.[78] CLAW does not require submission of open listings, but an open listing requires the homeowner and the agent to give up the exclusive representation that most homeowners want.[79]

**Antitrust Injury to Compass, Its Agents, and Homeowners**

81. CLAW's conduct causes significant, direct harm to Compass, its agents, and consumers. The harm resulting from this anticompetitive scheme encompasses the following:

---

[77] *See* Lillian Dickerson, T*he MLS/CLAW Partners with Compass, Revises Its IDX Policy* (May 6, 2026), https://www.realestatenews.com/2026/05/06/the-mls-claw-partners-with-compass-revises-its-idx-policy.

[78] CLAW Rules R. 10.1.1, at 25.

[79] The DOJ views mandatory-listing policies, coupled with "exceptions benefitting primarily large brokerages," as anticompetitive. Supplemental Statement of Interest of the United States, *Nosalek v. MLS Prop. Info. Network, Inc.*, No. 1:20-cv-12244-PBS, ECF No. 358, at 7 n.2 (D. Mass. Mar. 17, 2025). Rule 7.6 is precisely the sort of "exception" that makes CLAW Rules 7.5 and 7.5.1 anticompetitive.

a. *Lost Commissions and Financial Harm to Brokerage:* Compass has suffered direct financial harm through lost commissions due to Compass' inability to offer homeowners its phased marketing strategy, a superior product that attracts homeowners to Compass. Compass has also suffered direct financial harm through lost revenue from those homeowners through ancillary services, such as title and escrow services and mortgage services.

b. *Degradation of Compass Website:* The enforcement of the Anticompetitive Rules degrades Compass' proprietary technology platform by preventing Compass from posting pre-MLS listings in See It First™ on Compass, artificially suppressing web traffic and prospective leads.

c. *Depressed Sales Prices and Lost Sales:* By eliminating Compass' ability to pre-market and test pricing, CLAW rules force homeowners to launch blind on the MLS, frequently resulting in mispricing that depresses final home values, in lost sales, and in reduced commissions.

d. *Excessive Days on Market and Public Price Drops:* Forcing properties onto the MLS prematurely subjects them to the stigma of accumulating "days on market" and price reductions on the listing, which depress sale prices and related sales commissions.

e. *Lost Agents:* Compass is unable to compete for agents by offering them a phased marketing strategy that they can offer their clients. Moreover, on information and belief, CLAW supplies Compass agent listing and agent transaction data to third-party software vendors, which package those data into products that brokerages buy and use to target and recruit Compass agents. The data that CLAW forces Compass and its agents to give to the MLS should not be sold to a technology company that in turn further sells that data with its agent recruitment technology.

f. *Loss of Convenience and Harm to Innovation:* Homeowners are stripped of convenience surrounding their home sale, and consumers suffer from the commoditization of agent services and a reduction in pro-competitive choice.

82. Compass and its agents and homeowners have thus suffered antitrust injury as a result of the rules imposed by CLAW and the agents and brokerages who control it. CLAW's rules are anticompetitive because they foreclose homeowners and their agents from choosing a marketing strategy—limited, staged listing—that a substantial share of the market demands, thereby reducing product variety and consumer choice in the Relevant Markets. This restraint on competition directly causes Compass' injury: because Compass' phased marketing offering depends on the very marketing flexibility that the Anticompetitive Rules foreclose, CLAW's rules prevent Compass from offering phased marketing to homeowners and agents in the CLAW service area, making Compass less competitive in the Brokerage Services Market and the Agent Services Market. The mechanism of harm to competition and the mechanism of harm to Compass are one and the same: CLAW's rules prevent Compass from offering homeowners and agents innovative strategies they want.

83. Compass is therefore a proper party to bring this action. Compass' injury is direct, not derivative: it flows immediately from CLAW's rules and their enforcement against Compass agents and their homeowner clients. Compass' damages, including lost commissions, lost revenue from ancillary services, and diminished value of its technology platform, are neither speculative nor unduly complex to ascertain.

**CLAW's Enforcement of the Anticompetitive Rules Against Compass**

84. Compass California also enters into written independent-contractor agreements with each of the agents affiliated with it in the CLAW service area. Compass derives its revenue from the commissions generated by its agents' listings

and sales, and each agent relationship therefore carries the probability of future economic benefit to Compass. Compass continuously recruits agents affiliated with competing brokerages, and its ability to offer See It First™ on Compass is a significant reason agents affiliate with Compass where See It First™ on Compass is available.

85. Because of the Anticompetitive Rules and the escalating sanctions CLAW threatens for violating them, Compass California cannot offer See It First™ on Compass to homeowners in the CLAW service area as designed. Instead, it can offer only the limited versions those rules permit: an office exclusive that may not be publicly marketed at all; CLAW's "Coming Soon" status, which requires submitting the listing to CLAW, where it is visible to every CLAW participant and subscriber, and which is limited to 45 days; or CLAW's "MLS Exclusive" status, which likewise requires submitting the listing to CLAW and exposing it to CLAW's entire membership.[80] None of these options permits the limited public marketing before MLS submission that gives phased marketing its value. Homeowners in the CLAW service area who would choose pre-MLS public marketing therefore cannot obtain it from Compass, and Compass loses the listings, commissions, ancillary revenue, and agent recruits that See It First™ on Compass would otherwise attract.

86. CLAW also actively enforces the Anticompetitive Rules against Compass agents. On or about March 18, 2026, CLAW issued a Clear Cooperation "First Warning Notice" under Rule 7.5.1 to a Compass California agent concerning a listing in West Hills, stating that the property was "advertised for sale but . . . not listed in the MLS," that the agent was required to register for and attend a compliance class, and demanding a response within two business days. The homeowner had signed paperwork directing that the home be marketed first as a Compass private

---

[80] *See* CLAW Rules R. 7.5, at 16; *id.* R. 7.5.1, at 17; *id.* R. 7.6, at 17; *id.* R. 10.1(a), at 24; *id.* R. 10.1.1, at 25.

exclusive, both to protect the homeowner's privacy and to test the market before exposing the home to CLAW's entire membership. The agent promptly contacted CLAW, which dismissed the warning, and the listing was promptly entered into CLAW.

87. CLAW's enforcement had its intended effect. The agent, who has worked as a real estate agent for more than 25 years and depends on access to CLAW for her livelihood, will no longer offer Compass' private exclusive or other pre-MLS marketing options to her clients for fear of further warnings, fines, and discipline. On information and belief, other agents aware of CLAW's enforcement have likewise been deterred from offering pre-MLS marketing options to their clients.

88. On September 8, 2026, Compass demanded that CLAW cease fining or punishing its agents for publicly marketing office exclusive listings and confirm in writing by October 6, 2026, that it would do so. On September 18, 2026, Compass followed up, providing CLAW with the federal court's order denying Zillow's motion for a preliminary injunction. CLAW never responded to Compass' demand.

**CLAW's Continuing Violations**

89. CLAW's anticompetitive conduct is ongoing. The Anticompetitive Rules are a continuing agreement among competing brokers to penalize and exclude any broker or agent who follows a homeowner's instruction to publicly market a home outside the MLS, and CLAW enforces that agreement through citations, escalating fines under its citation policies of up to $15,000 for a single violation, disciplinary hearings, and the threat of suspension and expulsion.[81]

90. Within the four years before this complaint was filed, CLAW and its co-conspirators have committed new and independent acts that renew the restraint and inflict new and accumulating injury on Compass, including:

---

[81] 2024 Citation Policy §§ I, L; Model Citation Policy §§ I, K, at 57–61; CLAW Rules R. 14.1–14.3, at 53–54.

a. issuing, in 2026, a Clear Cooperation warning under Rule 7.5.1 to a Compass California agent concerning a listing in West Hills and directing the agent to attend a compliance class;

b. re-adopting and re-approving the Anticompetitive Rules, including in the version of its rules effective July 1, 2026;

c. appointing new MLS Committee members to propose the rules and new Professional Standards Committee members to decide alleged violations, many of whom are competing brokers;

d. declining to respond to Compass' September 8, 2026, demand and continuing to enforce Rule 7.5.1 after Compass' October 6, 2026, deadline; and

e. continuing, each day, to prohibit Compass and its agents from publicly marketing listings in accordance with homeowners' instructions, and to threaten fines and other sanctions when they do.

91. Each of these acts caused Compass new injury—lost commissions, lost ancillary revenue, lost agents, and diminished value of its technology platform—that Compass could not have recovered in an earlier action because that injury had not yet occurred.

92. Each of the acts listed above required CLAW to make a fresh, discretionary decision to maintain or enforce the Anticompetitive Rules—a decision CLAW was free not to make—and each inflicted new and accumulating injury on Compass. Compass seeks damages for injuries caused by acts within the applicable limitations periods, and its claims for injunctive relief are timely because CLAW continues to maintain and enforce the Anticompetitive Rules today.

## CAUSES OF ACTION

## COUNT I
## PER SE ILLEGAL GROUP BOYCOTT
## IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

93. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

94. A majority of the members of CLAW's Board of Directors are brokers or agents who are direct competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. They are therefore horizontal competitors with each other and with Compass.

95. Through the Anticompetitive Rules, CLAW forces Compass and its agents to forgo either (1) a critical input to their business (access to CLAW in the CLAW service area) or (2) the ability to offer innovative pre- and off-MLS marketing strategies to homeowners and agents.

96. The agreement by and among CLAW and its governing members to implement and enforce these rules is, therefore, a *per se* group boycott—a *per se* illegal combination, contract, or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Per se* treatment is warranted because CLAW possesses market power in the MLS Market in the CLAW service area; it controls access to an input—MLS participation—that agents need to compete effectively in the CLAW service area; and the challenged rules lack any plausible efficiency justification, because they govern agents' marketing to the public rather than the integrity or sharing of data within the MLS.

97. As a direct and proximate result of CLAW's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

## COUNT II
## COMBINATION, CONTRACT, AND CONSPIRACY CONSTITUTING UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

98. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

99. CLAW provides MLS services to thousands of real estate professionals across a service area spanning much of Los Angeles County. Membership in CLAW and access to the MLS it operates are critical for agents working in the CLAW service area. CLAW is controlled by agents and brokerages who are horizontal competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. CLAW and the agents and brokerages who control it are using their control of CLAW to restrain competition in the Brokerage Services Market and the Agent Services Market by implementing and enforcing the Anticompetitive Rules, which prevent Compass from offering See It First™ on Compass to its homeowner clients and agents and prevent any other agent from offering innovative pre- and off-MLS marketing strategies.

100. The rules' anticompetitive effects—reduced product variety, reduced competition among brokers on the timing, sequence, and scope of listing distribution, and reduced competition for agents—substantially outweigh any pro-competitive benefit. Any legitimate objective could be achieved through substantially less restrictive means, like CLAW's pre-2020 alternatives and the rules of the many MLSs that permit pre-MLS public marketing. Alternatively, the anticompetitive character of the rules is obvious enough to warrant an abbreviated, "quick look" analysis.

101. As a direct and proximate result of CLAW's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

## COUNT III
## COMBINATION IN RESTRAINT OF TRADE IN VIOLATION OF THE CARTWRIGHT ACT (CAL. BUS. & PROF. CODE § 16720 *et seq.*)

102. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

103. CLAW and each member of its Board of Directors are each a "person" within the meaning of California Business and Professions Code Section 16702. CLAW's adoption, maintenance, and enforcement of the Anticompetitive Rules is a combination of the capital, skill, or acts of two or more persons—CLAW and its competing Board members and Participants have each agreed in writing to abide by and be bound by its rules—and therefore is a "trust" under Section 16720.

104. The purpose and effect of that combination is to create and carry out restrictions in trade or commerce, in violation of Section 16720(a), by preventing homeowners and their agents in California from publicly marketing listings except through CLAW's distribution and by preventing Compass from offering phased marketing in competition with CLAW's agent-members. The combination is unlawful, against public policy, and void under Section 16726.

105. The combination is a group boycott that is unlawful *per se*. Alternatively, it is an unreasonable restraint of trade because its anticompetitive effects in the relevant markets alleged above substantially outweigh any pro-competitive benefit, which in any event could be achieved through substantially less restrictive means.

106. The combination was formed and carried out in California, is enforced against agents licensed in California, and restrains the marketing of residential real estate located in California.

107. As a direct and proximate result of the combination, Compass has been injured in its business and property, including through lost listing contracts, commissions, and revenue from ancillary services, and diminished value of its technology

platform. Compass' injury flows from that which makes the combination unlawful: the suppression of competition in how, when, and to whom homes are marketed.

108. Under California Business and Professions Code Section 16750(a), Compass is entitled to injunctive relief, three times its damages, interest, and its reasonable attorneys' fees and costs of suit.

## REQUESTED RELIEF

Compass requests the following:

A. A declaration that the Anticompetitive Rules are an unlawful restraint of trade under 15 U.S.C. § 1 and California Business and Professions Code Sections 16720 and 16726;

B. An injunction prohibiting CLAW from adopting, maintaining, or enforcing the Anticompetitive Rules, or any similar rule, to penalize any participant or subscriber for publicly marketing a property that the homeowner has directed be withheld from, or submitted later to, the MLS;

C. An award of treble actual, compensatory, and consequential damages in an amount to be proven at trial in addition to pre- and post-judgment interest as allowed by law;

D. An award of Plaintiffs' attorneys' fees and costs of suit; and

E. Such other relief as the Court deems just and equitable.

Dated: November 12, 2026

By: /s/ Howard D. Gest

Howard D. Gest (SBN: 76514)
hgest@burhenngest.com
BURHENN & GEST LLP
12401 Wilshire Boulevard, Suite 200
Los Angeles, CA 90025
Telephone: 213-629-8787

Nathan P. Eimer (*pro hac vice forthcoming*)
neimer@eimerstahl.com
Vanessa G. Jacobsen (*pro hac vice forthcoming*)
vjacobsen@eimerstahl.com
Alec Solotorovsky (*pro hac vice forthcoming*)
asolotorovsky@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600

Brian Y. Chang (SBN: 287757)
bchang@eimerstahl.com
EIMER STAHL LLP
1999 South Bascom Avenue, Suite 1025
Campbell, CA 95008
Telephone: 408-889-1670

*Attorneys for Plaintiffs*
*Compass, Inc. and Compass California, Inc.*

## JURY DEMAND

(Fed. R. Civ. P. 38)

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Compass hereby demands a trial by jury as to all claims so triable.

Dated: November 12, 2026

By: /s/ Howard D. Gest
Howard D. Gest (SBN: 76514)
hgest@burhenngest.com
BURHENN & GEST LLP
12401 Wilshire Boulevard, Suite 200
Los Angeles, CA 90025
Telephone: 213-629-8787

Nathan P. Eimer (*pro hac vice forthcoming*)
neimer@eimerstahl.com
Vanessa G. Jacobsen (*pro hac vice forthcoming*)
vjacobsen@eimerstahl.com
Alec Solotorovsky (*pro hac vice forthcoming*)
asolotorovsky@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600

Brian Y. Chang (SBN: 287757)
bchang@eimerstahl.com
EIMER STAHL LLP
1999 South Bascom Avenue, Suite 1025
Campbell, CA 95008
Telephone: 408-889-1670

*Attorneys for Plaintiffs*
*Compass, Inc. and Compass California, Inc.*